**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:                              :         Chapter 13
    CAROL A. ORAWSKY,          :
                     :
         Debtor          :         Bky. No. 07-12200ELF
                     :


# O P I N I O N

BY:   ERIC L. FRANK, U.S. BANKRUPTCY JUDGE


## I.  INTRODUCTION

Carol A. Orawsky ("the Debtor") filed a chapter 13 bankruptcy petition on April 17,

2007.  Her proposed Amended Chapter 13 Plan ("the Plan") provides for her to maintain contract

payments on her only secured debt and to make plan payments for distribution to the holders of

allowed unsecured claims.  The Plan places the Debtor's unsecured claims into two categories: (1)

student loan claims that are presumptively nondischargeable under 11 U.S.C. §1328(a)(2) and (2)

all other allowed unsecured claims.  Proportionately speaking, the Plan proposes to make a greater

distribution to the Debtor's student loan creditor than to the remaining unsecured creditors,

because it requires the Debtor to maintain her monthly student loan payments during the life of

the Plan.

This case is before the court on two matters.  First, the Trustee has filed a Motion to

Dismiss the bankruptcy case ("the Motion").  Second, the Debtor seeks confirmation of her Plan

over the objection of the Chapter 13 Trustee, William C. Miller ("the Trustee").

In the Motion, the Trustee contends that the Debtor's Plan fails to commit all of the

Debtor's disposable income for payment of unsecured debts, see 11 U.S.C. §1325(b).  In his

Objection to Confirmation ("the Objection"), the Trustee asserts that the Plan violates 11 U.S.C.

§1322(b)(1) by unfairly discriminating in favor of her student loan creditor to the significant

disadvantage of her other unsecured creditors.

On October 30, 2007, a consolidated hearing on the Motion and on confirmation of the

Plan was held and concluded.  The Debtor was the only witness.  After the hearing, the Debtor

and Trustee submitted written memoranda in support of their respective positions and the Debtor

submitted a reply memorandum.  The last submission was filed on December 4, 2007.

For the reasons set forth below, I will:

1. **deny the Motion** because I find that the Plan does not violate §1325(b)'s
   requirement that all of the Debtor's projected disposable income that is
   received during the applicable commitment period be applied to make
   payments to her unsecured creditors; see id. §1325(b); and

2. **overrule the Trustee's Objection and confirm the Plan** because I find that
   the Plan's separate classification of the student loan obligation and proposal to
   make a greater distribution to the student loan creditor does not "discriminate
   unfairly" against the other unsecured creditors in violation of 11 U.S.C.
   §1322(b)(1).

This Opinion constitutes my findings of fact and conclusions of law pursuant to Fed R.

Bankr. P. 7052.

## II.  FINDINGS OF FACT

The relevant facts are largely undisputed.

1. The Debtor is a 26 year old, single woman.  She lives in Newtown, Pennsylvania with a

   roommate and has no dependents.  (N.T. 24, 27, 42).

2. Since December 2005, the Debtor has been employed as a social worker for the state of New

Jersey.  (N.T. 25, 37).

3.     In March 2007, prior to the filing of her bankruptcy petition, the Debtor was injured on the

        job.  She was on disability leave from approximately late March or early April 2007 through

        late July 2007.  (N.T. 25).

4.     During her disability leave, the Debtor's income was greatly reduced as compared to her

        typical monthly salary.  (N.T. 25; Schedule I, Docket Entry No. 1).[1]

5.     According to her Chapter 13 Statement of Current Monthly Income and Calculation of

        Commitment Period and Disposable Income (Docket Entry No. 3) (hereinafter "Form 22C"),

        the Debtor has an annualized "current monthly income"[2] of $45,588.00 and is an "above-

        median"[3] chapter 13 debtor.

6.     The Debtor's current annual salary is $50,000.00.  (N.T. 25).

_____

[1]         Paragraph 17 of the Debtor's Schedule I states:

            Debtor was recently injured on the job and has been out of work since
            4/11/07.  She will be getting surgery on 5/4 and expects to be out of work
            for two full months following the surgery.  During this period, she will be
            receiving only temporary disability payments in the amount of $502 per
            week.

        Schedule I reflects that, when not on disability leave, the Debtor's monthly gross salary
was $3,846.00, which is roughly $961.00 a week.  The Trustee has not disputed any of the
income and expense information provided by the Debtor in her schedules or in her Form 22C.

[2]         See 11 U.S.C. §101(10A) (defining "current monthly income").

[3]         Under 11 U.S.C. §1325(b), the methodology used to determine whether a plan is
confirmable differs depending upon whether the debtor's annualized current monthly income is
above or below the median family income in the applicable state that corresponds to the size of
the debtor's household.  See id. §1325(b)(3), (4).

7. The Debtor's Form 22C reflects disposable monthly income of **negative** $580.97.

8. Together with her bankruptcy petition, the Debtor filed schedules. In those schedules, the

   Debtor disclosed:

   a. Net take home pay of $2,493.00 per month (Schedule I, Docket Entry No. 1);

   b. Total average monthly expenses of $2,273.00, which includes a monthly expense of
      $217.00 for student loan payments (Schedule J, Docket Entry No. 1); and

   c. Total monthly net income of $220.00. (Schedule J, Docket Entry No. 1).

9. On July 12, 2007, to reflect an increase in her monthly rent (N.T. 28), the Debtor filed an

   Amended Schedule J that reflected total average monthly expenses of $2,388.17 (after

   deducting $217.00 for student loan payments) and monthly net income of $104.83.

   (Amended Schedule J, Docket Entry No. 20).

10. The Debtor owns no real estate (Schedule A, Docket Entry No. 1) and has $23,653.00 in

    personal property (Schedule B, Docket Entry No. 1), the bulk of which is comprised of a

    2006 Volkswagen Jetta.

11. The Debtor has no non-exempt property. (Schedule C, Docket Entry No. 1).[4]

12. On July 25, 2007, the Debtor amended her original chapter 13 plan and filed the Plan.

    (Docket Entry No. 21).

13. The Plan provides for disparate treatment of her unsecured creditors. Specifically, the

    Debtor's Plan proposes, in relevant part:

    a. that the Debtor pay $100.00/month for 60 months to the Trustee;

---

[4] The existence or non-existence of non-exempt property affects the amount of
money that must be distributed to unsecured creditors for a chapter 13 plan to be confirmed. See
11 U.S.C. §1325(a)(4); see also In re Funches, 381 B.R. 471, 490 (Bankr. E.D. Pa. 2008).

      b.  that the Trustee use these payments to pay:

          i.  all administrative expenses; and

          ii.  <u>pro</u> <u>rata</u> distribution to unsecured creditors except that, "[p]ursuant
to 11 U.S.C. § 1322(b)(5), Debtor shall make all postpetition
payments on her non-dischargeable student loan obligations
directly to Sallie Mae in accordance with the contract terms."

(Plan ¶¶ 2(e), 5) (emphasis added) (Docket Entry No. 21).[5]

14.  Two proofs of claim have been filed in this bankruptcy relating to the Debtor's outstanding

student loans:

      a.  Proof of Claim No. 2, filed by Sallie Mae, Inc. on behalf of United Student Aid
Funds, Inc. in the amount of $29,398.34 ("the Larger Student Loan") and;

      b.  Proof of Claim No. 9, filed by Sallie Mae Ed Trust/Wilmington Trust in the
amount of  $4,200.79 ("the Smaller Student Loan").[6]

15.  The Debtor incurred the student loan debts to finance her undergraduate or graduate studies

in social work. (N.T. 37-40).

14.  According to the Debtor, the combined, scheduled monthly payment for these student loans

is $217.00. (N.T. 27-28).[7]

---

[5]      On its face, the Plan also provides for payment of all priority claims and all
secured claims.  However, no priority claims were filed. The Debtor's only secured claim is held
by the lender who is secured by her automobile and who will receive no distribution from the
Trustee because the Debtor proposes to pay directly to the lender the monthly installments on the
automobile loan as they fall due under the terms of the contract.  (<u>See</u> Plan ¶4).


[6]      For the sake of convenience, I shall refer to the creditor(s) to whom the debt
obligations on Claims 2 and 9 are owed simply as "Sallie Mae."


[7]      The notes underlying the Larger and Smaller Student Loans were not produced or
introduced into evidence.  I have taken judicial notice of the filing of the proofs of claims relating
to the two loans at the Debtor's request and without objection. <u>See</u> Fed. R. Evid. 201;  <u>In re</u>

15.   The Larger Student Loan has a 2.625% interest rate and a 240-month term.  (N.T. 30, 31).

This loan is a consolidation of a number of smaller educational loans.  (N.T. 30).

16.   The Smaller Student Loan has an interest rate between 10-11%.  (N.T. 29).  The Debtor does

not know the term of this loan.  (N.T. 31).

17.   The Debtor is eligible to take one more voluntary forbearance on the Larger Student Loan.

(N.T. 44-45).

18.   The Smaller Student Loan is subject to a form of phased-in debt forgiveness. After the

Debtor has spent 5 years doing social work, the Smaller Student Loan will be "expelled."

(N.T. 30-31).

19.   By December 28, 2007, the Debtor had been working for 3 years as a social worker.  (N.T.

37).  Accordingly, assuming the absence of any intervening disqualifying factors, on

December 28, 2009, the Debtor's Smaller Student Loan will be eligible to be forgiven.

20.   Up to the time of her bankruptcy filing, the Debtor was current in making payments on the

Smaller Student Loan, while the Larger Student Loan was either deferred or in forbearance.[8]

21.   As a result of back-to-back periods of deferment and voluntary forbearance, the Debtor has

never been required to make a payment on the Larger Student Loan.  (N.T. 41).

22.   One impetus for the Debtor's decision to file for bankruptcy relief in April 2007 was that the

_____

Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998);  See also In re Indian Palm
Assocs., Ltd., 61 F.3d 197, 205 (3d Cir. 1995). I note that the computer printouts attached to the
proofs of claim appear to list $81.94 as the scheduled payment amount on the Smaller Student
Loan and $160.95 as the scheduled monthly payment on the Larger Student Loan.  If correct,
these numbers would add up to a total scheduled monthly payment of $242.89.

[8]      In her testimony, the Debtor used both terms.  Compare N.T. 28, 26, 41 (using
"deferred") with id. 41 (using "voluntary forbearance").

Larger Student Loan was about to enter repayment and she did not believe she could afford

the payments in light of the debt service required by her other debts.  (N.T. 41, 42).  The

Debtor also felt overwhelmed by the combination of her consolidation loans, credit card

debt, student loans, car loan and rent.  (N.T. 42).

23.    The Debtor concedes that her student loan debt obligations are nondischargeable in her

bankruptcy.  (Plan ¶5); <u>see</u> 11 U.S.C. §1328(a)(2); <u>id.</u> §523(a)(8).

24.    The Claims Register reflects:

    a.    $25,168.16 in secured claims;[9]

    b.    $61,423.91 in unsecured claims**,**  $27,824.78 of which is comprised of non-student
          loan-related debt obligations; and

    c**.**    $2,054.00 in administrative expenses.[10]

25.    By the October 30, 2007 confirmation hearing, the Debtor had not yet made any

of the direct monthly payments to Sallie Mae that her Plan required because she was not

financially capable of doing so.  (N.T. 33).[11]  Her bank statement was "very negative" each

---

[9]       The Claims Register states that secured claims total $50,336.32, but that total
appears to be the result of an error.  VW Credit's original claim and amended claim were added
together rather than the latter substituting the former.  It appears that VW Credit is asserting a
single, secured claim of $25,168.16 and not two separate claims for the same amount.

[10]       This is based on the expectation of the Debtor's counsel that counsel fees in that
amount will be allowed as an administrative expense pursuant to 11 U.S.C. §§503(b) and 11
U.S.C. §330(a)(4)(B).  I have previously observed that the filing of a proof of claim for an
administrative expense for counsel fees is "of questionable legal significance."  <u>In re Murray</u>,
2007 WL 2317523, *4 n.8 (Bankr. E.D. Pa. Aug. 6, 2007).

[11]       I infer from the Debtor's testimony and her counsel's representations that, during
the initial postpetition period, the Debtor was still in the process of recovering financially from
the effects of the reduced income she received while on disability leave.  The Trustee has not

week.  Id.


### III.  THE TRUSTEE'S MOTION TO DISMISS WILL BE DENIED

#### A.  The Trustee's Motion Will Be Treated as a Motion Under 11 U.S.C. §1307(c)

In the Motion, the Trustee requests dismissal of the case because the Debtor's Plan fails
to commit all of the Debtor's disposable income for the benefit of her unsecured creditors.   In
support of the Motion, the Trustee relies upon 11 U.S.C. §1325(b).[12]  That section provides, in
pertinent part:

> (1) If the trustee or the holder of an allowed unsecured claim objects to the
> confirmation of the plan, then the court may not approve the plan
> unless, as of the effective date of the plan –
>
> *   *   *
>
> (B) the plan provides that all of the debtor's projected disposable income
> to be received in the applicable commitment period beginning on the date
> that the first payment is due under the plan will be applied to make
> payments to unsecured creditors under the plan.

At the outset, I observe a "disconnect" between the statutory text and the Motion.  In
seeking dismissal, the Trustee does not cite the Code provision governing dismissal of chapter 13
cases, but instead refers to a Code provision addressing legal standards pertaining to plan

_____

argued that this temporary period of difficulty impacts the feasibility of the Debtor's Plan under
11 U.S.C. §1325(a)(6).


[12]      In his Motion, the Trustee cited §1325(b)(2).  Actually, that provision is a
definitional subsection to §1325(b).  It provides the definition of the term "disposable income"
used in subsection (b)(1).

confirmation.

Involuntary dismissal of chapter 13 cases is governed by 11 U.S.C. §1307(c), which provides, inter alia, that a case may be dismissed "for cause, including" any one of eleven (11) grounds that are set forth in separate subsections. Nowhere in §1307(c)(1) through (11) has Congress provided that a chapter 13 debtor's failure to propose a plan that satisfies the disposable income requirements of §1325(b) is, in and of itself, "cause" for dismissal.

I recognize that the statutory examples of cause for dismissal set forth in §1307(c)(1) - (11) are not exclusive and, therefore, the failure to comply with other Code provisions may provide "cause" for dismissal of a chapter 13 case.[13] Also, I am aware that the Trustee regularly files motions to dismiss chapter 13 cases based on §1325(b). In fairness to the Trustee, I suspect that, in citing that section in such motions, he has simply left out a step in articulating his reason for requesting dismissal. It is likely that the more precise basis for the Motion is §1307(c)(1), which authorizes dismissal for "unreasonable delay by the debtor that is prejudicial to creditors." Therefore, I flesh out the Trustee's implicit argument to be that by proposing a plan that is inconsistent with §1325(b) and which will not be confirmed (because the Trustee will object under §1325(b)), the Debtor has unduly delayed the administration of the case to the prejudice of creditors, thus providing "cause" for dismissal.

---

[13]    See, e.g., In re Lilley, 91 F.3d 491, 494 (3d Cir. 1996) ("It is . . . beyond dispute that a court may consider matters other than those enumerated in section 1307(c) as grounds for dismissal of a Chapter 13 petition."); Lucabaugh v. I.R.S., 2001 WL 997416, at *3 (E.D. Pa. June 26, 2001) ("Section 1307(c) of the United States Bankruptcy Code provides a nonexhaustive list of grounds upon which a bankruptcy court may dismiss a Chapter 13 case for 'cause'."); 8 Collier on Bankruptcy ¶ 1307.04 (15th rev. ed.) ("The grounds enumerated in subsections 1307(c)(1) through (11) are not exhaustive. For example, the court also has the power to dismiss the case if the debtor is not eligible to be a debtor because of failure to meet the requirements of subsection 109(a), (e) or (g) of the Bankruptcy Code.").

Undoubtedly, there are cases in which a debtor's failure to propose a confirmable plan and the attendant delay justify dismissal of the case.[14]  At the same time, however, the bankruptcy court is accorded considerable discretion in evaluating whether "cause" exists and whether dismissal is the appropriate remedy.[15]  Thus, that a debtor has proposed a plan that the Trustee considers unconfirmable, standing alone, does not necessarily establish cause for dismissal. See In re Javorone, 181 B.R. 151 (Bankr. N.D.N.Y. 1995); In re Jernigan, 130 B.R. 879 (Bankr.  N.D. Okla. 1991).

In any event, the issue whether the Trustee's Motion should be granted under §1307(c) arises only if confirmation of the Plan is denied.  As explained below, the Plan will be confirmed. Thus, no grounds exist for dismissal under §1307(c)(1).

**B.  The Motion Will Be Treated As An Objection to Confirmation, But Will Be Denied**

While the Trustee styled his papers in opposition to the Plan as a motion to dismiss, the Motion, for all intents and purposes, is an objection to confirmation of the Plan, based on the Plan's alleged failure to satisfy the requirements of 11 U.S.C. §1325(b), and was treated as such at

---

[14]     See, e.g., In re Jackson, 2007 WL 1188202 (Bankr. E.D. Pa. Apr. 18, 2007); In re Asken, 2007 WL 1056724 (Bankr. E.D. Pa. Apr. 3, 2007); In re Patton, 2007 WL 853742 (Bankr. E.D. Pa. Mar. 16, 2007); In re Wile, 310 B.R. 514, 517 (Bankr. E.D. Pa. 2004).

[15]     See In re Kane, 1998 WL 259945, at *3 (Bankr. E.D. Pa. May 18, 1998) ("the decision of whether to dismiss a case under §1307(c) is within the discretion of the Court"); In re Cottle, 189 B.R. 591 (Bankr. E.D. Pa. 1995); In re Samuel, 77 B.R. 520 (Bankr. E.D. Pa. 1987); 8 Collier on Bankruptcy, ¶ 1307.04[4] (15th rev. ed.) ("As under the other subsections of section 1307(c) [i.e., sections other than §1307(c)(4)], the court's power to dismiss or convert is discretionary.").

the confirmation hearing.  Thus, I perceive no prejudice to the Debtor in treating the Motion as an

objection to confirmation under 11 U.S.C. §1325(b).  Compare Fed. R. Bankr. P. 3015(f)

(requiring the filing of objections to confirmation) with Fed. R. Bankr. P. 1001 (instructing the

courts to construe the rules "to secure the just, speedy, and inexpensive determination of every case

and proceeding").

To paraphrase 11 U.S.C. §1325(b), upon objection, the court may not confirm a plan if

the plan fails to provide that all of the debtor's projected disposable income ("PDI") shall be used

to pay the allowed claims of unsecured creditors.  As the party raising an objection under 11 U.S.C.

§1325(b), the Trustee bears the initial burden of presenting evidence that the Debtor's Plan does

not satisfy §1325(b).[16]   The Trustee has failed to meet that initial burden.

The Trustee's §1325(b) argument is based on the false premise that the Debtor's Plan

proposes to pay only $100.00 per month to unsecured creditors.   In fact, the Plan commits $317.00

each month for 60 months for the payment of unsecured claims.  The Plan provides for the Debtor

to make two (2) distinct monthly payments to unsecured creditors.  First, the Debtor must pay

$100.00 directly to the Trustee to be used for a distribution to the holders of allowed administrative

expenses, to the Trustee for his commission and to the holders of allowed unsecured claims other

than Sallie Mae.  Second, the Plan obligates the Debtor to pay $217.00 each month directly to

Sallie Mae, the Debtor's student loan creditor.  That the Debtor, rather than the Trustee, is serving

---

[16]     See In re Edwards, 2004 WL 316418 at *10 (Bankr. D. Vt. Feb. 13, 2004)
(citations omitted) (describing burdens of proofs when §1325(b)(1)(B) is raised via an objection
to confirmation); 8 Collier on Bankruptcy, ¶ 1325.08[2] (15th rev. ed.) ("[b]ecause it is the
responsibility of the objecting party to raise the issue of ability to pay, that party has, at a
minimum the initial burden of producing satisfactory evidence to support the contention that the
debtor is not applying all disposable income to plan payments").

as the disbursing agent for the amount being paid to Sallie Mae on account of its allowed

unsecured claims does not alter the fact that the payments are being made "pursuant to", "in," or

"under" the Debtor's Plan.  See In re Trusty, 2007 WL 3274420 at *1 n.5 (Bankr. E.D. Pa. Nov. 5,

2007); In re Perez, 339 B.R. 385, 390 n.4 (Bankr. S.D. Tex. 2006), aff'd, 373 B.R. 468 (S.D. Tex.

2007); accord In re Veneto, 343 B.R. 120, 133 n.21 (Bankr. E.D. Pa. 2006).  In other words, the

$217.00 still "counts" in calculating the total commitment of income designated by the Plan for

payment of allowed unsecured claims.

       The Trustee has neither suggested nor presented any evidence to establish that the Debtor

has the means and legal obligation to commit more than $317.00 a month to her Plan.  Schedules I

and J, which contain what the Trustee refers to as the Debtor's "actual income and expenses" (see

Trustee's Mem. of Law at 5), do not suggest that the Debtor has any ability to pay more than the

$317.00 per month that she proposes to commit for repayment of her unsecured debt.  Indeed, I

infer from Schedules I and J and the Debtor's testimony, which I credit, that the Debtor is making

personal sacrifices to be able to carve out funds each month to devote to the Plan.  This is not a

Debtor who has substantial wiggle room in her budget.[17]

       To the extent that the Trustee complains that the plan payment is insufficient, he is

objecting only to the relative distribution as between Sallie Mae and the other holders of allowed

unsecured claims. In other words, the Trustee's §1325(b) objection is simply a restatement of his

§1322(b)(1) unfair discrimination objection.

_____

       [17]      See N.T. 33-34 ( unchallenged testimony that the Debtor is still recovering from
the financial effects of her disability leave a few months earlier, that she had a bank balance that
was "very negative" and that she was unable to fund the first few months' direct payments to
Sallie Mae).

-12-

For these reasons, I conclude that the Plan does commit all of the Debtor's PDI for payment of unsecured creditors and I will overrule the Trustee's objection to confirmation under §1325(b).[18]  The §1322(b)(1) objection to confirmation is addressed separately below.


## IV.  THE TRUSTEE'S OBJECTION TO CONFIRMATION WILL BE OVERRULED

### A.  Introduction

The Trustee objects to confirmation of the Debtor's Plan on the ground that the Plan "unfairly discriminates" in violation of 11 U.S.C. §1322(b)(1) because the Plan provides Sallie Mae with a distribution greater than the pro rata distribution to be paid to the Debtor's other unsecured creditors.  Section 1322(b)(1) provides that a:

> plan may . . . designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated . . . .

Id. (emphasis added).[19]

---

[18]      Because I conclude that the Debtor's proposed payments of $217.00 per month are to be made "under the plan," I need not and do not reach the Debtor's argument that student loan payments may constitute "special circumstances" warranting a downward adjustment to the Debtor's calculation of disposable income.  See 11 U.S.C. §1325(b)(3) (incorporating §707(b)(2)(A) and (B) for purposes of determining projected disposable income under §1325(b)(2)); id. §707(b)(2)(B) (providing for rebuttal of presumption of abuse by demonstration of "special circumstances" that justify "additional expenses or adjustments of current monthly income").

[19]      Strictly speaking, one might question whether an objection to confirmation is properly brought under 11 U.S.C. §1322(b).  That section identifies various terms that may be included in a plan.  On its face, it does not purport to identify mandatory plan provisions, an interpretation that is reinforced when its text is compared to that of §1322(a).  See In re Szostek, 886 F.2d 1405, 1411 (3d Cir. 1989) (describing §1322(a) as containing "mandatory requirements for confirmation" of a chapter 13 plan).  On the other hand, because the power to designate different classes of unsecured claims set forth in §1322(b)(1) is restricted by the prohibition

According to its plain language, §1322(b)(1) permits a plan to divide unsecured claims

into different classes and even tolerates discrimination (in a nonpejorative sense of the word)

amongst classes of unsecured claims, provided that the plan does not discriminate "unfairly."[20]

That brings me to the broader issue the Trustee has raised:  namely, may the Debtor separately

classify and preferentially pay her student loan creditor without running afoul of the limitations

imposed by §1322(b)(1)?  In other words, does the Debtor's Plan "unfairly" discriminate against

her non-student loan related unsecured creditors as the Trustee asserts?[21]

---

against discriminating unfairly, the Trustee's citation of §1322(b)(1) as the basis for the objection is understandable.  Perhaps the objection is better conceptualized as an objection based on 11 U.S.C. §1325(a)(1) or (a)(3) (providing that a plan shall be confirmed if it "complies with the provisions of this chapter" and has been proposed "not by any means forbidden by law").  In any event, the Debtor does not contest the Trustee's right to assert the "unfair discrimination" objection.

[20]    See, e.g., In re Leser, 939 F.2d 669, 671-72 (8th Cir. 1991) ("by allowing for separate classes of unsecured claims, Congress anticipated some discrimination, otherwise separate classes would have no significance.  It is only unfair discrimination that is prohibited") (quoting In re Storberg, 94 B.R. 144, 146 (Bankr. D. Minn. 1988)); In re Alicea, 199 B.R. 862, 865 (Bankr. D. N.J. 1996) ("a plan may designate more than one class of unsecured claims and discriminate in their treatment, provided it doesn't do so unfairly"); In re Eiland, 170 B.R. 370, 374 (Bankr. N.D. Ill. 1994) ("the statutory prohibition [in §1322(b)(1)] is limited to plans that 'discriminate unfairly'").

[21]    The parties also debate another issue.  The Debtor asserts that her discriminatory plan is nonetheless authorized by 11 U.S.C. §1322(b)(5), which provides that a plan may provide for the cure of a default and maintenance of payments while the case is pending "on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Id. (emphasis added).  The Trustee argues that because the Debtor's student loans were not in default prior to the filing of her bankruptcy, §1322(b)(5) is unavailable to her.

Courts are divided on this issue of whether §1322(b)(5) provisions are excepted from §1322(b)(1) fairness scrutiny.  See, e.g., In re Colley, 260 B.R. 532 (Bankr. M.D. Fla. 2000) (collecting cases that hold that plan provisions for payment of student loans that qualify for

-14-

## B.  The Statutory Concept of "Unfair Discrimination"

The issue whether it is fair to separately classify and monetarily favor student loan creditors in a chapter 13 plan has been litigated to a well-worn path in the case law generally, albeit one courts have traversed consulting varied guideposts.[22]  One of the chief difficulties that has troubled courts in their efforts to resolve the fairness question is that the Bankruptcy Code does not provide any standard for determining when a Chapter 13 plan discriminates "unfairly."

In the absence of explicit Congressional directive, several courts and legal commentators

---

§1322(b)(5) treatment are exempt from §1322(b)(1) scrutiny, which <u>Colley</u> characterizes as the minority view, and cases that hold that  §1322(b)(5) plan provisions must still pass §1322(b)(1) "unfair discrimination scrutiny", which <u>Colley</u> characterizes as the majority view); <u>see also</u> David M. Holliday, Annotation, <u>Chapter 13 Plan that Separately Classifies Student Loan Debt as Unfair Discriminatory Treatment of Class of Unsecured Claims Under §1322(b)(1) of the Bankruptcy Code (11 U.S.C.A. §1322(b)(1))</u>, 6 A.L.R. Fed.2d 507, §§17-18 (2007) ("ALR Annotation") (collecting cases).

I find it unnecessary to decide whether the Plan properly invokes §1322(b)(5) or whether treatment of a long-term, nondischargeable, unsecured debt under §1322(b)(5) renders discriminatory treatment of other unsecured claims inherently fair under §1322(b)(1).  This is because, as explained below, I find that proposed discrimination in this case is not unfair under §1322(b)(1), even without consideration of §1322(b)(5).

[22]     <u>See, e.g.</u>, ALR Annotation §§9-16 (collecting cases that apply different tests and presumptions and reach varying results in analyzing what constitutes "unfair" discrimination in the student loan classification context); <u>see also</u> <u>In re Sullivan</u>, 195 B.R. 649, 653 (Bankr. W.D. Tex. 1996):

> Separate classification of student loan indebtedness has been the subject of quite a number of bankruptcy opinions since 11 U.S.C. §523(a)(8) was enacted in 1990.  It is possible to find case law support for just about any proposition, ranging from the allowance of a separate class providing for the 100% payment of student loans while general unsecureds receive practically nothing, to the disallowance of any plan that proposes to treat student loan creditors substantially different than other unsecured creditors.

have gone in quest of the origins of the concept of unfair discrimination in the Bankruptcy Code

and of the legislative history animating its inclusion in §1322(b)(1).  See, e.g., Stephen L.

Sepinuck, Rethinking Unfair Discrimination in Chapter 13, 74 Am. Bankr. L.J. 341, 347-49 (Fall

2000) (herein, "Sepinuck"); Bruce A. Markell, A New Perspective on Unfair Discrimination in

Chapter 11, 72 Am. Bankr. L.J. 227, 230-31 (1998); see also In re Simmons, 288 B.R. 737, 744-

748 (Bankr. N.D. Tex. 2003).  What has emerged from their journey is the conclusion that the

concept of unfair discrimination was designed to maintain equity among creditors of equal priority.

The legislative history has proven to be too scant to provide further guidance beyond this level of

generality, however.

Hence, courts have been left to struggle to formulate a feasible, practical, reasoned

approach in applying the "unfair" discrimination restriction of §1322(b)(1).  As a result of these

efforts, an array of different tests have been articulated, critiqued, rejected and re-formulated over

the years.  One early court, after observing that decisions on the issue of what constituted "unfair"

discrimination ran the "gamut from everything goes to nothing is allowed," was led to conclude

that "somewhere between total whim and an Act of God lies the answer to what justification is

needed to hew out a particular class of unsecured creditors and distinguish it from other unsecured

creditors."  In re Hill, 4 B.R. 694, 697-698 (Bankr. D. Kan. 1980).

The majority of courts faced with answering the question of when discrimination is

"unfair" apply some form of multi-factored test.  The Eighth Circuit Court of Appeals articulated

the most widely-applied test in a case involving preferential treatment of child support payments.

In re Leser, 939 F.2d at 672.  The Ninth Circuit Bankruptcy Appellate Panel ("BAP") utilizes an

identically-factored test for scrutinizing "unfair" discrimination.  See In re Wolff, 22 B.R. 510

-16-

(B.A.P. 9th Cir. 1982).   Under the Leser/Wolff test, a court judges the fairness of proposed

discrimination by looking at whether:

> 1.   the discrimination has a reasonable basis;
>
> 2.   the debtor can carry out a plan without the discrimination;
>
> 3.   the discrimination is proposed in good faith; and
>
> 4.   the degree of discrimination is directly related to the basis or rationale
>      for the discrimination.

Leser, 939 F.2d at 672 (citations omitted); Wolff, 22 B.R. at 512.

While the Leser/Wolff test has been widely applied, so too has it been criticized

frequently for its reliance on undefined notions of what is "reasonable", "legitimate" and "in good

faith."  One legal commentator has collected and summarized some of those criticisms:

> First, on a conceptual level, no legal standard comprised merely of a
> collection of factors can be applied with any degree of confidence or
> predictability . . . .  This point is bolstered by the fact that the factors
> listed are apparently not intended to be exhaustive of appropriate considerations.
>
> Second, again like many multifactor tests, the relationship among the
> factors is unclear.  For example, after concluding that a plan failed the
> first prong, because the proposed discrimination was unreasonable,
> one Bankruptcy Appellate Panel nevertheless went on to analyze the
> remaining prongs.  In contrast, a district court recently concluded there
> was no need to evaluate other factors after concluding that a proposed
> plan failed the first prong.
>
> Third, on a more specific level, the interrelationship of at least three of the
> factors makes the test quite redundant.  For example, the reasonableness
> of the plan's discrimination (factor one) will necessarily be affected and
> informed by the necessity of that discrimination (factor two) . . . .
>
> Fourth, each of the individual factors is itself unclear, suspect or circular.
> The first factor's requirement of reasonableness depends upon the interests
> advanced in support of the discrimination, but no makes no effort to identify
> what interests can justify it.  As a result, it lacks precision and leaves the issue
> to the court's subjective discretion . . . .  The third factor's inquiry into good

> faith is completely redundant of §1325(a)(3) . . . .  Beyond that, it is circular
> to measure fairness in relation to good faith, since good faith itself requires
> a substantial measure of fairness.

Sepinuck, <u>supra</u> at 355-59.

A few courts have responded to the perceived flaws in the <u>Leser</u>/<u>Wolff</u> test by trying to improve the test by incorporating additional factors.  For example, in <u>In re Husted</u>, 142 B.R. 72 (Bankr. W.D.N.Y. 1992), in determining whether a debtor could specially classify past-due child support, the bankruptcy court developed a <u>five</u>-factor test.[23]  Similarly dissatisfied with the workings of the <u>Leser</u>/<u>Wolff</u> test, the bankruptcy court in <u>In re Bird</u>, 1994 WL 738644 (Bankr. D. Idaho Dec. 23, 1994) articulated an <u>eight</u> factor test.[24]

---

[23]     The <u>Husted</u> court's test requires consideration of:

1.  whether there is a rational basis for the classification;

2.  whether the classification is necessary to the debtor's rehabilitation under chapter 13;

3.  whether the discriminatory classification is proposed in good faith;

4.  whether there is meaningful payment to the class discriminated against; . . . .

5.  the difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there was no separate classification.

142 B.R. at 74 (cited in <u>In re Kolbe</u>, 199 B.R. 569, 572-3, 574 (Bankr. D. Md. 1996)).


[24]     The factors developed by the <u>Bird</u> court in the context of assessing disparate treatment of priority debts, are:

1.  whether the discrimination substantially enhances or is necessary to the feasibility of the plan;

Of course, the inevitable consequence of any multi-factored test, as highlighted above in

the criticisms of the Leser/Wolff test, is that it devolves into a "totality of the circumstances" or

"case-by-case" analysis, thereby running the risk of being depicted as an ad hoc, potentially purely

subjective determination.  See, e.g., In re Groves, 39 F.3d 212, 214 (8th Cir. 1994) (noting that

application of the "discriminate unfairly" standard may "involve little more than exercise of the

bankruptcy court's broad discretion"); cf. In re Crawford, 324 F.3d 539 (7th Cir. 2003) (referring

to exercise of bankruptcy court's discretion in nonpejorative terms).[25]

---

> 2.  whether the discrimination reflects chapter 7 liquidation priorities;
>
> 3.  whether the discrimination is otherwise contemplated by the Code;
>
> 4.  whether the creditor discriminated against will receive more under the plan then [sic] it would in a hypothetical chapter 7 liquidation;
>
> 5.  if the creditors as a whole will receive more under the plan then [sic] in a hypothetical chapter 7 liquidation, will the discrimination encourage the use of chapter 13;
>
> 6.  will the discrimination reduce the chances that the debtor will be forced to file bankruptcy in the future;
>
> 7.  does the discrimination enhance an interest of the debtor which is otherwise protected or furthered by the Code; and
>
> 8.  the extent of the discrimination.

1994 WL 738644, at *4.

[25]    In Crawford, speaking through Judge Posner, the court stated candidly:

> We haven't been able to think of a good test ourselves [under §1322(b)(1)].  We conclude, at least provisionally, that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decisionmaker, the bankruptcy judge, to seek a result that is

Other approaches to the issue of unfair discrimination have been articulated.  A
bankruptcy  court in the Northern District of Illinois adopted a "legitimate interests of the debtor"
test.  See In re Lawson, 93 B.R. 979, 984 (Bankr. N.D. Ill. 1988) (per Wedoff, J.).  Under this
approach, discrimination is fair to the extent it rationally furthers an articulated, legitimate interest
of the debtor.

The "legitimate interests of the debtor" approach was rejected by an Illinois district court
in McCullough v. Brown, 162 B.R. 506 (N.D. Ill. 1993), rev'g 152 B.R. 232 (Bankr. N.D. Ill.
1993).   The McCullough court found that the "legitimate interests of the debtor" test was
improperly "bottomed on the assumption that the 'unfair discrimination' standard is to be tested
solely from the standpoint of the debtor[]."  Id. at 512.  The court reasoned that §1322(b)(1), being
a creditor protection device, should trigger an inquiry from the standpoint of the disfavored creditor
class and that "[e]ducated self interest . . . [could] be counted on to avoid any proposal that would
operate 'unfairly' against the drafter."  Id.

While stating that it was "cheerfully reject[ing] any temptation to formulate a universal
standard by which to measure all future class-discriminatory plans," Id. at 516, the McCullough
decision is most commonly associated with the "correlative benefit to the creditor" approach.
Under this analysis, to justify discrimination a debtor is required to place something material on the
scales to show correlative benefit to the disfavored creditors.  See also In re Chapman, 146 B.R.
411, 419 (Bankr. N.D. Ill. 1992) (examining whether discrimination provides an offsetting benefit

reasonable in light of the purposes of the relevant law, which in this case is
Chapter 13 of the Bankruptcy Code.

324 F.3d at 542.

to the creditors subject to discrimination).  This test has its critics too, including one court that

reasoned that "the very term 'discrimination' contemplates that there will be no evening up of the

creditors."  <u>In re Bird</u>, 1994 WL 738644 at *3.

      Several other tests and hybrids of the above-referenced tests have also been applied to

determine what constitutes "unfair" discrimination.  I do not endeavor to name all of them.

      In this Circuit, there is no binding precedent concerning what factors should be

considered or what test should be implemented in assessing what constitutes "unfair"

discrimination.  Certain courts have applied the test for analyzing unfair discrimination that was

articulated in 1987 in <u>In re Furlow</u>, 70 B.R. 973, 978 (Bankr. E.D. Pa. 1987), pursuant to which

"different treatment is permissible if and only if the debtor is able to prove a reasonable basis for

the degree of discrimination by the Plan."  <u>Id.</u>; <u>see also</u> <u>In re Weiss</u>, 251 B.R. 453 (Bankr. E.D. Pa.

2000); <u>In re Alicea</u>, 199 B.R. at 866.  Other courts have applied the <u>Leser/Wolff</u> test to analyze the

fairness of proposed discriminatory treatment in a Chapter 13 plan.  <u>See, e.g.</u>,  <u>In re Dubravski</u>,

1999 WL 669294 at *1 (Bankr. M.D. Pa. May 18, 1999) (involving a plan that proposed to pay

recipients of bad checks in full, while providing nominal distribution to other unsecured creditors

was unfairly discriminatory).  Our Court of Appeals has not spoken on this issue.


**C.  Plan Fairness Issues in the Student Loan Context**

      Before proceeding further to analyze the Debtor's Plan, I find it helpful to review more

specifically the special issues raised by the separate classification and treatment of student loan

debts and how courts have tackled those issues.

      In the student loan context, issues regarding the fairness of separately classifying and

preferentially treating educational debt came to the fore with the enactment of the Student Loan

Default Prevention Initiative Act of 1990, Pub. L. 101-508, §§ 3001, 3007, 104 Stat. 1388, 1388-

25, 1388-28 (eff. Nov. 5, 1990) ("the 1990 Act"), which made certain government-sponsored

educational loans nondischargeable in Chapter 13.[26]   Prior to this time, student loan claims were

generally dischargeable in Chapter 13 under 11 U.S.C. §1328(a).  By way of the 1990 Act,

Congress amended §1328(a)(2) to add §523(a)(8) as an exception to discharge.

The 1990 Act created an "impetus to classify student loans as either payable in full (like a

priority claim) or substantially payable (to the extent that 100% disposable income could afford to

pay) and as a result [in order to maximize] the debtor's fresh start following discharge."  Oliver B.

Pollak & David G. Hicks, Student Loans, Chapter 13, Classification of Debt, Unfair

Discrimination and the Fresh Start After the Student Loan Default Prevention Initiative Act of

1990, 1999 Det. D.L. Rev. 1617, 1629 (Winter 1993).  Not only are student loan debts likely to be

nondischargeable, but the claims also accrue interest during the life of a chapter 13 plan if the

debtor does not maintain monthly payments.  See Leeper v. Pennsylvania Higher Educ. Assistance

Agency, 49 F.3d 98 (3d Cir. 1995).  Thus, chapter 13 debtors have a compelling reason to seek, at

minimum, to pay their student loan creditors whatever portion of disposable income is required to

avoid the postpetition accrual of interest and/or penalties, lest the debtors emerge from bankruptcy

owing significantly more on this nondischargeable debt than they did upon entering bankruptcy.[27]

---

[26]      As a result of the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 (Pub. L. 109-8) (BAPCPA), both government-sponsored and private student loans are
nondischargeable in a chapter 13 bankruptcy.  See §1328(a)(2); §523(a)(8).

[27]      I use "compelling" to mean "understandable" and "rational" and not to suggest
that a motivation that is "compelling" to the debtor is necessarily "fair" for purposes of

The courts' receptivity to debtors' efforts to favor their educational debt has varied.  At one end of the spectrum are courts that have announced a "bright line" rule prohibiting "any discrimination in favor of nondischargeable student loan obligations over other other unsecured creditors."  See In re Taylor, 137 B.R. 60, 65 (Bankr. W.D. Okla. 1992).  Other courts have deemed preferential treatment of educational loan claims as "presumptively unfair."  See, e.g., In re Caruso, 2001 WL 34076052 (Bankr. C.D. Ill. July 16, 2001); In re Perrine, 2001 WL 34076434 (Bankr. C.D. Ill. July 13, 2001).  And, not surprisingly, nowhere have debtors fared least well, in terms of §1322(b)(1) scrutiny, than when they have proposed plans that have sought to accelerate their student loan obligations and pay those obligation in full during the Chapter 13 plan with little or no dividend to the remaining unsecured creditors.[28]

Employing various rationales, many courts have ruled that chapter 13 plans that propose to pay student loan claims at rates substantially higher than other unsecured debts unfairly discriminate and cannot be confirmed, particularly if the debtor offers no justification for the discrimination other than the nondischargeable nature of the educational debt.[29]  The concerns that

---

§1322(b)(1).

[28]    See, e.g., In re Bentley, 266 B.R. 229 (1st Cir. B.A.P. 2001) (denying plan that proposed to pay student loan in full and other unsecured creditors a 3.6% dividend); In re Williams, 253 B.R. 220 (Bankr. W.D. Tenn. 2000) (applying Leser/Wolff test on a sua sponte motion to deny confirmation of a plan that would pay student loans in full with only a 15-25% dividend to other unsecured creditors); In re Chapman, 146 B.R. at 412 (plan proposed to pay student loan in full while paying other unsecured creditors a 10% dividend); In re Lawson, 93 B.R. at 989 (plan proposed to pay student loan in full with 10% dividend to remaining unsecured creditors).

[29]    See, e.g., In re Belda, 315 B.R. 477; In re Mason, 300 B.R. 379 (Bankr. Kan. 2003); In re Carlson, 276 B.R. 653 (Bankr. D. Mont. 2002); In re Caruso, 2001 WL 34076052; In

have most troubled the courts are the following:

**1.   Policy favoring equal treatment of creditors.**   While providing an honest debtor a "fresh start" is an important policy driving interpretation of the Code, equal treatment and strict prioritization of claims are also important principles. Given that "nothing in the Code or case law . . . defines 'fresh start' as the emergence from bankruptcy completely free of all debt," In re Mulkey, 2005 WL 4659360 at *2 (Bankr. N.D. Ga. Sept. 29, 2005), where discrimination favoring student loan claims creates a tension between these two policies, which policy should prevail?  Better yet, how may these two policies be balanced - or should they be?

**2.   Shifting the burden of nondischargeability from the debtor to creditors holding dischargeable, unsecured claims**.  It has been said that, in making educational loans nondischargeable, Congress has evidenced a preference that "those who benefitted from the loans should not be allowed to avoid the burden of repayment (except in the most dire circumstances)."  Id. (citing In re McCullough, 162 B.R. at 516).  As a general proposition then, is it unfair (and contrary to Congressional intent) to effectively shift the burden of repayment from the chapter 13 debtor to the holders of dischargeable claims?  See, e.g.,, In re Crawford, 324 F.3d at 541 (describing issue on appeal in case involving preferential treatment of child support payments as consideration of "the circumstances in which and the degree to which a Chapter 13 debtor may shift the burden of nondischargeable debt from his shoulders to those of his unsecured creditors by invocation of 11 U.S.C. § 1322(b)(1) . . . .").  Perhaps even more to the point, some courts express concern over the apparent lack of equity "for creditors holding nondischargeable claims . . . who may . . . pursue post-bankruptcy collection efforts against the debtor . . . to be preferred not only after the bankruptcy case is completed but also during the time payments are being made to creditors."  See,  e.g., In re Coonce, 213 B.R. at 346.

**3.   The absence of express, statutory priority in the Code**.  Some courts have observed that if Congress wished to permit debtors to prefer their student loan creditors in chapter 13 plans and shift part of the burden of this nondischargeable debt to the remaining unsecured creditors, it could have granted educational loans statutory priority and it did not.  As such, does the confirmation of plans that propose to discriminate in favor student loans grant an impermissible de facto priority to these claims?  See, e.g., In re Mulkey 2005 WL 4659360 at *2 (citing

re Perrine, 2001 WL 34076434; In re Thibodeau, 248 B.R. 699 (Bankr. Mass. 2000); In re Cronk, 131 B.R. 710 (Bankr. Iowa 1990).

-24-

In re Sperna, 173 B.R. 654 (9th Cir. B.A.P. 1994); In re Colfer, 159 B.R. at 609).

While these are all legitimate concerns, there are responses that merit consideration.  For example, while equality of creditor treatment is indeed a core principle of bankruptcy law, interpreting that principle to mean that pro rata distribution is mandated in every situation is arguably contrary to §1322(b)(1)'s express authorization for separate classification and discrimination with respect to different types of unsecured claims.  Additionally, while it is true that Congress did not make student loan obligations priority debts as it did with child support payments, one commentator has noted that there are many reasons why Congress might have done so that have no bearing on whether a debtor should be permitted to give them favored treatment in a Chapter13 plan.[30]  And, notwithstanding certain arguments against discriminatory treatment derived from the statutory text that arguably are analogous to those outlined above, many courts permitted discrimination in favor of child and spousal support claims in chapter 13 plans prior to the enactment of the BAPCPA  –  frequently on the ground that public policy so strongly favors payment of these claims that favored treatment is appropriate.  See In re Leser, 939 F.2d 669; In re Benner, 146 B.R. 265; In re Whittaker, 113 B.R. 531 (Bankr. D. Minn. 1990); In re Storberg, 94 B.R. 144 (Bankr. D. Minn. 1988).  Query whether the public interest in protecting the solvency of

---

[30]     Foremost among these is that priorities apply in Chapter 7 as well as in Chapter 13, and priority in Chapter 7 may not be appropriate. Moreover, priority claims must be paid in full in Chapter 13, and it would be impossible for many debtors with outstanding student loans to pay them off during a three-year or five-year plan.  Thus, priority treatment would actually foreclose many debtors from seeking Chapter 13 relief.

See Sepinuck, supra at 18.

educational loan programs, see In re Pelkowski, 990 F.2d 737, 743 (3d Cir. 1993); In re Webb, 370

B.R. 418, 426 (Bankr. N.D. Ga. 2007), provides a foundation for permitting a chapter 13 plan to

favor repayment of student loans based on public policy considerations?[31]  Is such discrimination

even more justifiable if coupled with Code's fresh start policy (such as a case in which a debtor can

make a particularized showing that, absent the discrimination, his or her financial rehabilitation

will likely be undermined by the accrual of interest and penalties during the pendency of the

chapter 13 in amounts so substantial as to be oppressive)?


## D.  Bentley  – A Framework For Analyzing Fairness

In In re Bentley, the First Circuit Bankruptcy Appellate Panel articulated a framework for

analyzing the issue of unfair discrimination against the backdrop of chapter 13 bankruptcy policy.

At issue in Bentley was whether a plan that provided for full payment of student loans and a

dividend of approximately 3% to remaining unsecured creditors violated §1322(b)(1).

The court in Bentley started with the premise that in using "fairness" as a standard in

---

[31]      But see, e.g.,  In re Pora, 353 B.R. 247,251 (Bankr. N.D. Cal. 2006) (rejecting public policy argument in student loan context); In re Beauchamp, 283 B.R. 287, 288  (Bankr. D. Minn. 2002) (observing that "[p]ublic policy ensuring repayment of student loans is not as significant" as the public policies favoring payment of alimony and child support); In re Colley, 260 B.R. at 536 (finding that "[t]he Congressional policies behind §1328(a)(2) and the "fresh start" policy behind the Code itself are patently insufficient to justify the creation of such priorities in the student loan context."); In re Cox, 186 B.R. at 746 ("The federal government's need for the repayment of student loans, while an important policy objective, does not approach a family's need for the immediate payment of alimony or child support obligations."); In re Taylor, 137 B.R. at 62 ("whatever public policy favors repayment of student loans is not as significant as that favoring alimony and child support payments").

§1322(b)(1), "Congress did not intend to leave courts with a notion so abstract as to supply no

definite content or real guidance or to require each judge to define fairness according to his or her

own lights . . . ." 266 B.R. at 239.  Instead, Congress must have intended "fairness" to have been

interpreted by reading §1322(b)(1) "as mandating the standard of fairness that is implicit in

Chapter 13, the context in which the term is used." Id.; see also In re Colfer, 159 B.R. at 608 &

n.20 (fairness analysis requires consideration of "the impact of the discrimination on Congress'

chosen statutory definition of the legitimate interests and expectations of the parties-in-interest to

Chapter 13 proceedings" including distributional priorities, fresh start and expressly permitted

classifications).

　　　　Under the approach the Bentley court employed, the core principles and policies of

chapter 13 provide a "baseline" for evaluating a plan that proposes to deviate from the baseline.

See 266 B.R. at 240.  Plans that propose to deviate from the baseline to the detriment of a class of

creditors that are not offset by some benefit to the disfavored class are more likely (though not

necessarily) to be "unfair" under §1322(b)(1).  On the other hand, treatment that offers each class

benefits that are equivalent to those received at baseline results in treatment is more likely to be

deemed "fair."  Id.

　　　　In reviewing a chapter 13 plan that proposed to provide substantially more favorable

treatment to a student loan claim to the detriment of general unsecured claims, the Bentley court

identified four (4) baselines warranting consideration:[32]

---

[32]　　　The Bentley court also noted that:

> It is not clear whether there are factors outside the contemplation of
> Chapter 13 that might fairly justify departures from baseline.  None

1. **Equality of distribution** reflects the general expectation that, absent an express grant of priority, unsecured creditors will share equally in any dividend.  As a result of this principle, "fairness in Chapter 13 requires equality of distribution among nonpriority unsecured creditors, and the burden of justification is on those who propose plans to the contrary."  Id. at 240.

2. **Nonpriority of student loans** incorporates the notion that the Code does not grant student loans priority status.  Id. at 240-41.   The baseline expectation here is simply that nothing in the Code mandates treating student loans more favorably than general unsecured claims.

3. **Contributions: mandatory v. optional** expresses the chapter 13 requirement that a debtor devote all of his or her projected disposable income to a plan if the plan does not pay the full amount of allowed unsecured claims.  The expectation emanating from that requirement is that unsecured creditors would share pro rata from distributions funded with the debtor's mandatory contributions.

4. **A fresh start for honest debtors** is one of the Bankruptcy Code's fundamental purposes.  This baseline is tempered against the notion that Chapter 13 does not contemplate that debtors "will necessarily emerge from Chapter 13 entirely free of student loan obligations."  Id. at 242.

Insofar as Bentley sets out a framework for measuring discrimination and instructs that the degree of departure from the baseline is relevant in determining "fairness" under §1322(b)(1), I find it helpful.  In particular, I find it useful because it: (1) requires identification of the underlying bankruptcy policy principles that guide the determination; (2) recognizes that the decision regarding fairness has both a qualitative and quantitative component; and (3) suggests, at least implicitly, that the decision may involve a balancing of competing interests.

_____

are offered or evident in this case, but we hesitate to conclude
that the standard of fairness we propose is exhaustive and adequate
to every manner of discrimination between classes.

Bentley, 266 B.R. at 240 n.19.

-28-

**E.  The Debtor's Plan Is Not Unfairly Discriminatory**

It is the Debtor's burden to justify her Plan's disparate treatment of her unsecured claims and preferential treatment of her student loan debt.  See In re 222 Liberty Assocs., 108 B.R. 971, 991 (Bankr. E.D. Pa. 1990); see also In re Mason, 300 B.R. 379, 383 (Bankr. D. Kan. 2003); In re Carlson, 276 BR. 653, 658 (Bankr. D. Mont. 2002).  She must prove by a preponderance of the evidence that her proposed classification of creditors does not discriminate unfairly.  In re Stella, 2006 WL 2433443 at *2 (Bankr. D. Idaho June 28, 2006); In re Alicea, 199 B.R. 862, 866 (Bankr. D.N.J. 1996).[33]

**1.  the parties' positions**

The Debtor's primary argument is that her Plan is not unfair because it is funded, in her view, entirely with optional funds.[34]  She derives the premise of the argument, that the Plan is

---

[33]    See also In re Martorana, 2008 WL 1745784, at *2 (Bankr. E.D. Pa. Apr. 11, 2008) ("[t]he debtor has the ultimate burden of persuasion that his proposed chapter 13 plan meets the statutory requirements for confirmation"); accord, In re Hill, 268 B.R. 548, 552 (B.A.P. 9th Cir. 2001) ("The debtor, as the chapter 13 plan proponent, has the burden of proof on all elements of plan confirmation"); In re Heath, 182 B.R. 557, 560 (B.A.P. 9th Cir. 1995) ("In general, the debtor carries the burden of proving, by a preponderance of the evidence, that the plan complies with the statutory requirements of confirmation"); In re Weisser, 190 B.R. 453, 454 (Bankr. M.D. Fla. 1995); In re Norwood, 178 B.R. 683, 687 (Bankr. E.D. Pa. 1995).

[34]    The Debtor has also argued that her Plan's disparate treatment of unsecured claims is justified because if she fails to make her monthly student loan payments during the life of her plan, she will face nondischargeable accrued interest and/or penalties postpetition.  In other words, the Debtor suggests that the consequences to her of a non-discriminatory plan would be so onerous that the discrimination is not unfair.  I find it unnecessary to rule on the merits of this argument.

funded with optional funds, by reasoning:

> (1) Form 22C is the sole determinant of projected disposable income, or PDI;
>
> (2) her Form 22C shows negative income;[35] and, therefore,
>
> (3) her unsecured creditors are not entitled to any distribution.

Then, she argues that by contributing income to the Plan for distribution to her non-student loan unsecured creditors (in the amount of $6,000.00 reduced by administrative expenses), she is providing those creditors with a material benefit, one to which they have no legal entitlement.

The foundation of the Debtor's position regarding the fairness of her Plan's proposed discrimination is that §1325(b) does not require her to devote either the $217.00 per month that she proposes to pay Sallie Mae or the additional $100.00 per month to the other unsecured creditors. In other words, despite the fact that she claims an "actual" ability to devote $317.00 per month to repayment of her unsecured debts, she contends that 11 U.S.C. §1325(b) does not require her to do so. Her view is that her willingness to make these payments, albeit in a discriminatory fashion, increases the distribution for all creditors, rendering the discriminatory treatment fair. Indeed, she suggests that the non-student loan unsecured creditors will fare worse if confirmation is denied. In that event, she intends to propose an amended plan that will provide for 60 payments of $100.00 a month to the Trustee with a pro rata distribution to all unsecured creditors, including Sallie Mae. The obvious effect of such a plan would be to reduce the distribution to the non-student loan

---

[35] The reason why the "bottom line" in the Debtor's Form 22C is lower than that found in Schedules I and J is because most of the Debtor's projected, actual expenses in Schedule J are somewhat lower than the IRS expense allowances taken on Form 22C.

creditors by more than fifty percent (50%),[36] as compared to the Plan that is presently proposed for

confirmation.[37]

_____

[36]     The current Plan requires the Debtor to pay the Trustee $100.00 a month for sixty
(60) months, resulting in a total contribution of $6,000.00.  Subtracting administrative expenses
of $2054.00 and the Trustee's commission (estimated at 7% or $420.00), the non-student loan
creditors can expect a distribution of $3,526.00.   Because there are $27,824.78 in allowed non-
student loan claims, the dividend for that class is 12.6%.  Under the amended plan that the
Debtor states that she will file in the event the Plan is not confirmed, if the same $3,526.00
distribution available after administrative expenses and payment of the Trustee's commission is
paid to the holders of all allowed unsecured claims, which total $61,423.91(including Sallie
Mae), the resulting dividend is 5.7%.

[37]     It is not clear whether the amended plan that the Debtor says she will file if
"forced" to do so by denial of confirmation of the Plan would still require the Debtor to make
contractual payments directly to Sallie Mae.  If so, such a plan would be even more
discriminatory than  the Plan presently under consideration (because Sallie Mae would receive
distributions from both the Debtor and the Trustee resulting in payments excess of $217.00 per
month contractual obligation).  If the "forced" plan included an adjustment – providing that the
Debtor reduce her direct payment to Sallie Mae by the amount of the Trustee's distribution to
Sallie Mae – the amended plan would still be more discriminatory than the Plan presently
before the court for confirmation.  This is because Sallie Mae would continue to be paid its
contractual due while the other creditors would receive even less than their proposed distribution
under the Plan (because their distribution would be diluted by the Trustee's payments to Sallie
Mae).

It is also possible that denial of confirmation of the Plan would cause the Debtor
to propose a plan that provides for $100.00 per month plan payments to the Trustee but is silent
with respect to Sallie Mae ( i.e., does not require the Debtor to maintain contractual payments to
Sallie Mae).  Considering the prior expression of the Debtor's intent to pay Sallie Mae and her
apparent ability to do so as expressed in Schedules I and J, is it fair assume that the Debtor will
make the contractual payments to Sallie Mae?  If so, does the possibility or likelihood of such
payments to Sallie Mae continue to raise a §1322(b)(1) issue or even a §1325(a)(3) good faith
issue?  Or, would the Debtor's decision to use non-PDI income be totally within her discretion,
making it permissible for her to use that income to make discriminatory payments "outside the
plan" on account of a nondischargeable debt?

I describe these issues only to point out that if the Plan cannot be confirmed due to
§1322(b)(1)'s prohibition against unfair discrimination, any amended plan the Debtor might
choose to file may implicate issues similar to the ones presented by the Plan.

The Trustee has a different opinion regarding the unsecured creditors' entitlement.  The Trustee contends that Form 22C is just a starting point in the PDI analysis and that the Debtor's Schedules I and J must be considered as well.  <u>See</u> Trustee's Mem. of Law at 5 (citing <u>In re Plumb</u>, 373 B.R. 429 (Bankr. W.D.N.C. 2007) and <u>In re Edmonds</u>, 350 B.R. 636 (Bankr. D.S.C. 2006)). Had the Debtor not subtracted her student loan payment as an expense, improperly in the Trustee's view, consideration of Schedules I and J would require the Debtor to devote $317.00 a month to her Plan.  Working with the assumption that the Debtor is required to fund her Plan with $317.00 in PDI, the Trustee argues that if the Debtor were to implement a <u>pro rata</u> plan instead of her currently proposed Plan, her unsecured creditors would be entitled to a substantially greater dividend.[38]

In sum, to juxtapose their positions:  the Debtor contends that her Plan is being funded wholly with voluntary contributions and that it is not unfair for §1322(b)(1) purposes for her to devote that portion of her own funds that are required to satisfy her contractual obligation to pay monthly instalments to Sallie Mae, thereby avoiding the post-petition accrual of interest and penalties.  She distinguishes her Plan from those plans that were denied confirmation in the reported case law on the grounds that those debtors sought to accelerate their student loan obligation and pay it in full through the plan.[39]  She asserts that she filed for bankruptcy relief

_____

[38]    If payments of $317.00 per month were distributed <u>pro rata</u> in a nondiscriminatory manner, the unsecured creditors would share from a contribution of  $19,020.00 for a dividend of 25.45% (<u>i.e.</u>, total unsecured claims are $61,423.91; the Trustee's fee would be approximately $1331.40, administrative expenses are $2,054.00 - these total $3,385.40; this leaves $15,634.60 for distribution), or more than double the amount promised by the Debtor's proposed Plan.

[39]    <u>See, e.g.</u> <u>In re Mulkey</u>, 2005 WL 4659360 (Bankr. N.D. Ga. 2005); <u>In re Williams</u>, 253 BR 220 (Bankr. W.D. Tenn. 2000); <u>In re Kolbe</u>, 199 B.R. 569 (Bankr. D. Md.

under chapter 13, rather than chapter 7, in a sincere, good faith effort to pay some portion of her

debt obligation back to her creditors.  If I were to restyle the issue in terms of the <u>Bentley</u>

framework, the Debtor argues that, though discriminatory, the Plan places an additional benefit on

the scales for both her student loan creditor and the remaining unsecured creditors as a balance to

the discriminatory plan treatment.   In opposition, the Trustee contends that the Debtor's argument

is based on a false premise because §1325(b) requires that the Debtor pay $317.00 per month to

<u>all</u> of her unsecured creditors and there is no additional value being offered to justify the deviation

from chapter 13 norms.   <u>See</u> Trustee's Mem. of Law, at 2-5.  He urges me to deny confirmation on

that basis.[40]

　　　　Thus, the issue of plan discrimination under §1322(b)(1) has transposed, in large part,

into a dispute concerning the meaning of PDI under §1325(b)(2) and (3).  Accordingly, to properly

analyze the issue of unfair discrimination, I must first determine the Debtor's PDI.


## 2.  the meaning of "projected disposable income"

　　　　Like the issue whether a plan is "unfairly discriminatory" under §1322(b)(1), defining and

applying the term "projected disposable income" under §1325(b)(2) and (3) is no simple task.  In

the relatively short period of time since BAPCPA was enacted in 2005, there has been considerable

---

1996).

[40]　　　The Trustee states that he <u>would</u> recommend confirmation of a plan that would
pay $317.00 a month for a <u>pro rata</u> distribution to all of the Debtor's unsecured creditors.
Trustee's Mem. of Law, at 4.

litigation on the question without the development of a consensus.

Section 1325(b)(1)(B) speaks in terms of the debtor's obligation to make payments to

unsecured creditors under a plan funded with "all of the debtor's projected disposable income . . .

received in the applicable commitment period."  11 U.S.C. §1325(b)(1)(B).  What does the phrase

"projected disposable income" mean?  Should the determination of "projected disposable income"

be based solely on the historical recapitulation of income and the mixture of deemed and actual

expenses set forth on Form 22C, or should other evidence (such as Schedules I and J or other

sources) be considered?

Two lines of authority have developed concerning what "projected disposable income"

means in the post-BAPCPA world:

> One line of cases holds that the term "projected disposable income"
> differs from the term "disposable income" as it is described in
> section 1325(b)(2).  Therefore, the amount reflected on Form 22C
> for "disposable income" is merely a starting point for the court's
> inquiry for determining the "projected" amount of the debtor's
> disposable income, because the sums set forth in Form 22C are
> historical and are not forward looking.  [These cases] acknowledge a flexible,
> sliding scale taking into consideration changes in a debtor's circumstances.
>
>                                  . . .
>
> A second line of cases adopts the approach that the term "projected
> disposable income" is the same as the term "disposable income";
> and a mechanical test using historical data is to be utilized.   Among
> the first cases to follow this reasoning was In re Alexander, 344 B.R.
> 742 (Bankr. E.D.N.C. 2006).  The Alexander court determined that
> "disposable income" is determined from the six month period prior
> to filing.  Accordingly, the Alexander court concluded that projected
> disposable income is determined by taking the calculation for current
> disposable income and multiplying it by the number of months of
> the proposed plan.  Id. at 749.

In re May, 381 B.R. 498 (Bankr. W.D. Pa. 2008) (citations omitted).

Having considered the different approaches to defining PDI, the one I find most persuasive is articulated in In re Briscoe, 374 B.R. 1 (Bankr. D.D.C. 2007).[41]  The analysis of PDI in Briscoe, which I endorse, can be summarized in six (6) steps as follows.

First, it is difficult to reconcile either of the competing views of the meaning of PDI with the plain language of the statute.  Id. at 15.  On one hand, the PDI determination starts with a debtor's "current monthly income", which is expressly defined through a fixed, historical calculation, based on income the debtor received in the six (6) month period prior to the filing of the case.  See 11 U.S.C. §101(10A).  Yet, §1325(b)(2) refers to PDI as the difference between current monthly income "to be received" during the pendency of the plan less the debtor's reasonable expenses.  It is obviously a logical impossibility for prepetition income "to be received" postpetition.  The plain language of the statute would produce a PDI of $0.00 in every chapter 13 case  – an obviously absurd result that Congress could not have intended.  See generally Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004) (courts should apply plain language of statute unless the result is absurd).

Second, in pre-BAPCPA practice under §1325(b), "projected disposable income" meant income that was "predicted for the future" not income that was "calculated from the past" and historical information (typically, the information the debtor provides in Schedules I and J) was used only as a starting point in calculating PDI.  Briscoe, 374 B.R. at 15.  Courts still considered

---

[41]      Briscoe is also one of a number of cases that has collected the decisions in the competing lines of cases.  See 374 B.R.  at 13 nn. 9-10.

evidence that the debtor's financial disclosures were inaccurate or included unreasonable expenses

or that the debtor's financial circumstances had changed.  Id.

       Third, in the absence of any clear changes in the statutory text and legislative history on

this question, and considering the original purpose of §1325(b) (i.e., for a chapter 13 plan to be

entitled to confirmation, the debtor should make a good faith effort to repay his or her creditors

based on his or her projected income and reasonable expenses), it is reasonable to conclude that, in

enacting BAPCPA, Congress did not intend to change entirely prior practice in which PDI was

calculated as a prediction of the debtor's net future income that is available for commitment to the

plan.  Id. at 16-17.  As the court observed in In re Pak, 378 B.R. 257 (B.A.P. 9th Cir. 2007):

> The term "projected disposable income" is not new with
> the BAPCPA amendments to the Bankruptcy Code.  Before
> BAPCPA, "projected disposable income 'was derived from'
> income not reasonably necessary for maintaining or
> supporting the debtor or a dependent, with that determination
> being made on an estimated basis at plan confirmation."
> [quoting In re Slusher, 359 B.R. 290, 247 (Bankr. D. Nev.
> 2007)].  In most cases, disposable income was determined
> by subtracting the debtor's monthly expenses, as set forth
> on Schedule J, from the monthly net income on the
> debtor's Schedule I.
>
> Congress changed the determination of "disposable
> income" in chapter 13 under BAPCPA by adding extended,
> if not necessarily precise, definitional terms in §§ 1325(b)(2) and
> (b)(3)[42] and 101(10A). However, Congress did not alter either

---

[42]      Section 1325(b)(3) provides:

> Amounts reasonably necessary to be expended under paragraph
> (2), other than subparagraph (A)(ii) of paragraph (2), shall be
> determined in accordance with subparagraphs (A) and (B) of
> section 707(b)(2), if the debtor has currently monthly income,
> when multiplied by 12, greater than --

> the term "projected disposable income" in §1325(b)(1)(B) or
> the requirement of §1322(a)(1) that the debtor commit "such
> portion of future earnings or other future income of the debtor
> to the supervision and control of the trustee as is necessary for
> execution of the plan."

Id. at 262 (emphasis added to quotation in original).[43]

---

        (A) in the case of a debtor in a household of 1 person,
the median family income of the applicable State for 1 earner;
        (B) in the case of a debtor in a household of 2, 3 or
4 individuals, the highest median family income of the
applicable State for a family of the same number or fewer
individuals; or
        (C) in the case of a debtor in a household exceeding 4
individuals, the highest median family income of the applicable
State for a family of 4 or fewer individuals, plus $575 per month
for each individual in excess of 4.

[43]      As the Pak court states, no changes in the statute's text, other than the use of
"current monthly income" in §1325(b)(2) and the means test methodology of §1325(b)(3) for
above median debtors, evidence an intent to alter the prior methodology for calculating PDI.
And, as discussed above, the use of "current monthly income" in §1325(b)(2), by itself, is not
decisive on the issue.

      In addition, as the Briscoe court reasoned convincingly, that Congress did not
amend §1329, which permits debtors to modify their confirmed plans based on, inter alia,
changes in financial circumstances, and that it would make little sense for Congress to permit
modification of a plan when a debtor's financial circumstances change after confirmation, "but
not to provide for a realistic determination of the debtor's ability to make payments in the first
place."  374 B.R. at 16 (quoting In re Zimmerman, 2007 WL 295452, at *6 (Bankr. N.D. Ohio
Jan. 29, 2007)).  See also 11 U.S.C. §1323 (permitting pre-confirmation plan modification).

      The Briscoe court also observed that a forward-looking interpretation of PDI is
consistent with the "means test" methodology set forth in 11 U.S.C. §707(b) and incorporated
into the calculation of PDI for above-median debtors.  See 374 B.R. at 17; id. §1325(b)(3).
Section 707(b)(2)(B) provides that an above-median income debtor in chapter 7 may rebut the
presumption of abuse arising from § 707(b)(2)(A) by demonstrating "special circumstances ...
that justify additional expenses or adjustments of current monthly income for which there is no
reasonable alternative." Id.; § 707(b)(2)(B)(i).  In its murky draftsmanship, §1325(b)(3)
incorporates §707(b)(2) for purposes of determining an above-median chapter 13 debtor's

Fourth, although PDI is not fixed immutably by the Form 22C calculation for above-median chapter 13 debtors, absent evidence of changed circumstances (and assuming no objection to the accuracy of the information set forth on Form 22C), Form 22C will be the only evidence of and, therefore, conclusive as to the debtor's PDI.  <u>Briscoe</u>, 374 B.R. at 19.  In such cases, "Form 22C will . . .  have precisely the same function as the debtor's schedules had pre-BAPCPA: the evidentiary source for a presumption of disposable income that can be rebutted through the submission of extrinsic evidence."  <u>Id.</u>

Fifth, where the debtor, the trustee or a party-in-interest disputes the debtor's PDI as determined by Form 22C due to an alleged change or reasonably anticipated change in the debtor's income or expenses, courts must avoid the methodology of calculating PDI simply by importing the debtor's income and expense disclosures from Schedules I and J.  Rather, the court must employ the methodology set forth in §1325(b)(2) and (3) in calculating PDI based on the alleged changed circumstances.  Thus, on the income side of the equation, the court must honor the income

---

reasonable expenses.  However, unlike §707(b)(2), which appears to authorize adjustments to <u>both</u> current monthly income <u>and</u> expenses, it appears that §1325(b)'s "incorporation of the 'special circumstances' exception [of §707(b)(2)] only applies to the expense side of the 'disposable income' equation."  374 B.R. at 17.  The court then reasoned that this discrepancy gives rise to two alternate inferences: either Congress intended to make it more difficult for debtors to achieve confirmation of a chapter 13 plan than to qualify for chapter 7 relief (which was unlikely given Congress' preference for maximizing debt repayment) <u>or</u> the more plausible explanation -- <u>i.e.</u>, that "Congress recognized that the projection of the debtor's income for purposes of §1325(b)(1) would already take into account 'special circumstances' warranting 'adjustments of current monthly income' because the projection would be a forecast of the debtor's future income, not a calculation based on his past income."  <u>Id.</u> at 18.

Finally, the <u>Briscoe</u> court made the incisive observation that in chapter 7 cases, §707(b)(2) already adopts the counterintuitive concept that "current monthly income," an amount calculated based on fixed, historical events, is subject to being "adjusted" based on later events.  <u>Id.</u>  There is no policy reason why the same concept should not be imported into chapter 13.

exclusions found in 11 U.S.C. §101(10A) (e.g., Social Security benefits) and §1325(b)(2) (e.g.,

certain child support payments).  On the expense side of the equation, the court can adjust only

those expense deductions allowed under §707(b)(2) that are based on "actual expenses."  Briscoe,

374 B.R. at 19.

Sixth, in certain "extreme circumstances where the debtor's manipulation of the means

test amounts to an abuse of the chapter 13 process," a chapter 13 plan that satisfies 11 U.S.C.

§1325(b) must nonetheless be denied confirmation because it was not "proposed in good faith," as

required by §1325(a)(3).   Briscoe, 374 B.R. at 22.[44]  Nonetheless, "[o]nly those debtors engaging

in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or

otherwise proposed [their] [c]hapter 13 plan in an inequitable manner,' . . .  will run afoul of §

1325(a)(3)."  Id.[45]

With these concepts in mind, I consider the evidence regarding the Debtor's PDI.

---

[44]   "[T]here may be times when a debtor commits so little income to creditors,
relative to his true ability (for example, as a result of a windfall) to make payment to them based
on his actual expenses, that his proffered plan suggests a subjective intent not to make a good
faith effort at repayment at all."  Briscoe, 374 B.R. at 22.

[45]   Id. at 22 (quoting In re Goeb, 675 F.2d 1386, 1390 (9th Cir.1982)); accord, In re
Jensen, 369 B.R. 210, 233 (Bankr. E.D. Pa. 2007) (good faith under §1325(a)(3) is a narrow
doctrine employed only in extreme cases to protect the integrity of the bankruptcy system).

### 3.  the Debtor's PDI

Applying the principles discussed above, I conclude, without difficulty, that the Debtor's PDI is $0.00.[46]

The Trustee has not challenged the accuracy of the Debtor's calculation of PDI on Form 22C.  Nor has the Trustee produced any evidence of a change in income or expenses that formed the basis of the PDI calculation under 11 U.S.C. §1325(b)(2) and (3) as set forth on Form 22C.  The Trustee bases his view that the Debtor's PDI is $317.00 per month solely on the facts that: (1) the Debtor has proposed to commit to the Plan more than the PDI calculated in her Form 22C and (2) her Schedules I and J show the existence of net monthly income of $317.00 (once the Debtor's student loan payments are subtracted from the listed expenses).

I find the Trustee's methodology to be inconsistent with §1325(b)(3).  More than the mere consideration of Schedules I and J is required to modify the determination of PDI for above median debtors statutorily mandated by §1322(b)(2) and (3) as implemented through Form 22C.  If the existence of net monthly income in Schedules I and J, by itself, were determinative of PDI for above-median chapter 13 debtors, the elaborate statutory means test methodology for determining PDI required by §1325(b)(3), commonly viewed as the cornerstone of the BAPCPA reforms, would be nullified.  For this reason, to the extent that the Trustee argues that Schedules I and J

---

[46]    PDI is determined by projecting the debtor's monthly disposable income over the applicable commitment period, see 11 U.S.C. §1325(b)(2).  In this case, the Debtor's monthly disposable income, as calculated on line 58 of Form 22C, is negative number (minus $580.97).  The applicable commitment period is sixty (60) months.  Thus, a literal application of the statutory methodology would result in a negative PDI.  Because a negative amount is meaningless in the context of determining the amount of the distribution unsecured creditors are entitled to receive in a chapter 13 case, I find it more useful to refer to a negative PDI as a PDI of $0.00.

demonstrate that the Debtor's PDI is $317.00 per month, I reject that position as a matter of law.

Insofar as the Trustee's objection is intended to be a good faith objection under §1325(a)(3),[47] I reject that position as well.  There is no evidence that the Debtor engaged in any conduct that could be characterized as a manipulation of the means test or other Bankruptcy Code provisions in order to obscure or diminish her ability to pay her unsecured creditors.  Given the modest level of the Debtor's monthly income, it is unlikely that she is an individual who has found loopholes in the means test to enable her to maintain a luxurious lifestyle at the expense of her creditors.  See generally Eugene R. Wedoff, Means Testing in the New §707(b), 79 Am. Bankr. L.J. 231, 281 (2005) (critiquing the means test as "unlikely to provide a good measure of a debtor's actual ability to pay debts," in part due to complex and arbitrary IRS expense allowance standards that may work in favor of wealthy debtors).  The more likely inference to be drawn from the evidence is that the Debtor is making personal sacrifices to reduce her expenses below the level of the IRS standards that Congress has determined to be reasonable, so that she may generate money every month to pay her creditors.  As the Briscoe court stated:

> Bad faith is not demonstrated by showing that the debtor elected to spend less on one class of expenses (in an amount less than the expenses allowed by § 1325(b)(3)) and more on another class of expenses (in excess of the expenses allowed by § 1325(b)(3)), and arguing, without more, that the debtor's actual expenditure on the first class demonstrates that he has a greater ability to pay than is indicated by § 1325(b)(3).

Briscoe, 374 B.R. at 23.

------

[47]    I believe that is a fair interpretation of the Trustee's position.  I understand the Trustee to contend that it would be inappropriate for the Debtor to propose a plan committing less than $317.00 per month to her unsecured creditors because both her schedules and her plan show an actual ability to make such a payment.

For these reasons, I conclude that the Debtor's PDI is $0.00 and that neither §1325(b)(2) and (3) nor §1325(a)(3) compel her to commit $317.00 per month for payment of unsecured creditors in her chapter 13 plan.

### 4.  Application of <u>Bentley</u> to determine if the Plan's discrimination is unfair

I find that the Debtor has justified the Plan's deviation from the relevant chapter 13 baselines.[48]

The Debtor has chosen to voluntarily contribute $317.00 a month, for a total of $19,020.00, to her Plan. This funding is derived entirely from income that she is not legally obligated to commit to the Plan. She seeks to utilize this income, not to improve a moderate standard of living or indulge in luxuries, but to make some effort to repay her creditors.[49]  In doing

---

[48]    Out of the four baselines that <u>Bentley</u> identified -- <u>i.e.</u>, equality of distribution, nonpriority of student loans, mandatory vs. optional contributions and fresh start -- three are implicated. The Plan does not cause a deviation from the fourth baseline -- the expectation that mandatory plan contributions shall be distributed <u>pro rata</u> amongst a debtor's unsecured creditors -- because she is funding her Plan entirely with optional contributions. The parties have not identified any other chapter 13 or Bankruptcy Code policies or principles that require consideration as baselines other than those identified by the <u>Bentley</u> court nor have I culled any from their arguments.

[49]    The Debtor's voluntary contribution of payments in excess of her PDI obviously is a significant factor in this analysis. However, this decision does not hold that a debtor has <u>carte blanche</u> in proposing a discriminatory distribution in a chapter 13 plan funded entirely with "voluntary" contributions.

The view that there can never be unfair discrimination if an unsecured creditor is not entitled to any chapter 13 distribution was expressed in <u>In re Sutherland</u>, 3 B.R. 420 (Bankr. W.D. Ark. 1980):

Under circumstances like these, this Court would allow a classification for

so, she is not proposing to accelerate her student loan indebtedness and pay that accelerated

amount at the expense of her other unsecured creditors.  Rather, she seeks to continue to pay Sallie

Mae only its monthly contractual due in the ordinary course, a result that is consistent with

Congressional policy favoring the repayment of student loans even after the grant of bankruptcy

relief to a student loan borrower.  Further, the Debtor is proposing to use a significant portion of

her voluntary monthly contribution, not earmarked for student loan debt repayment, to repay her

general unsecured creditors.  As a result, the unsecured creditors other than Sallie Mae benefit

materially from the Debtor's Plan.  They are obtaining a 12.6% dividend where they might

otherwise obtain a 5.7% dividend or, in the worse case scenario, nothing.  In terms of the Bentley

analysis, the Debtor's Plan provides a tangible benefit to the disfavored class that bears a

reasonable relationship to the deviation from the relevant chapter 13 baselines.[50]

     For these reasons, I find that the Plan does not unfairly discriminate within the meaning

of 11 U.S.C. §1322(b)(1).  Accordingly, I overrule the Trustee's objection to confirmation and

---

                             unsecured creditors whose credit managers have red-headed secretaries.
                             Who would be hurt? Maybe some creditor could meet this test and, if so,
                             at least that creditor would be paid.

Id. at 422.  For a contrary view, i.e., that a plan may yet be unfairly discriminatory based upon
consideration of legal principles embedded in chapter 13 or perhaps even other sources of law
see McCullough v. Brown, 162 B.R. at 517.  I do not reach the issue.

    [50]      Previously, I noted that my disposition of this case made it unnecessary to decide
whether the right of a debtor to provide for the cure of a long-term debt under 11 U.S.C.
§1322(b)(5) is restricted by the "unfair discrimination" provision under §1322(b)(1).  See n.21,
supra.  Another issue that I need not and do not decide is whether, without reference to
§1322(b)(5) and without some compensating benefit to the disfavored class of creditors, there are
circumstances in which a debtor's interest in an effective financial rehabilitation and fresh start
may justify discriminatory treatment under §1322(b)(1).

confirm the Debtor's Plan.  An Order consistent with this Opinion will be entered.


**Date:**   __May 2, 2008__          _____

                                        **ERIC L. FRANK**
                                        **U.S. BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 13 |
| | : | |
| CAROL ORAWSKY, | : | |
| | : | Bky. No. 07-12200ELF |
| Debtor | : | |

## O R D E R

**AND NOW**, upon consideration of the Chapter 13 Trustee's Motion to Dismiss Case ("the Motion") and the Chapter 13 Trustee's Objection to Confirmation of the Debtor's Chapter 13 Plan ("the Objection"), and after a hearing, and upon consideration of the post-hearing written submissions of the parties, and for the reasons stated in the accompanying Opinion,

It is hereby **ORDERED** that:

1.  The Motion to Dismiss is **DENIED**.

2.  The Objection is **OVERRULED**.

3.  The Debtor's First Amended Chapter 13 Plan (Docket Entry No. 21) is **CONFIRMED**.

Date:  <u>May 2, 2008</u>

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

<u>Counsel</u>
Patricia A. Mayer
Attorney for Debtor

Leroy C Etheridge
Attorney for William C. Miller, Trustee